IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT TACOMA

STEPHEN J. OBERTO and KIM S. OBERTO, husband and wife,

Plaintiffs,

v.

PLATYPUS MARINE, INC., a Washington corporation

Defendant.

Case No.: 3:16-cv-05320-BHS

IN ADMIRALTY

DECISION, FINDINGS OF FACT AND CONCLUSIONS OF LAW

## DECISION

In the world of commerce, disputes arise when expectations of parties to a contract are not fulfilled. When those unmet expectations are spelled out as contractual obligations, a cause of action for a breach of contract is often the result. Stephen and Kim Oberto ("Obertos") come to this court seeking damages from Platypus Marine, Inc. ("Platypus") because they claim that their yacht, MAXIMO, suffered damages caused by Platypus when it breached the contract to paint the vessel by delivering a faulty paint job.

At the conclusion of the three-day trial the Court ruled that Platypus had breached the contract it entered into with the Obertos for the work of painting the hull above the waterline when it admittedly failed to apply the specified Awlgrip paint manufactured by AkzoNobel "according to Manufacturer's specifications and procedures." Now the Court awards damages to the Obertos in the amount of $58,775.86.

Because of Platypus' failure to properly test any suspect layers of paint over which the coating was to be applied, it was learned after the paint job was completed that some of the coatings underneath the new paint had been a one-part system which was incompatible with the new Awlgrip two-part system. The consequence of this discovery was that the new coatings left the surface soft, blistering and disintegrating in spots throughout the MAXIMO's hull. Had a test been performed before the work had begun, as prescribed by the manufacturer, the parties would have learned that the new coating would likely not have adhered properly unless the surface of the hull was taken down at least to the fairing layer.[1]

While there was some dispute as to whether the incompatible layers included the fairing compound, the most persuasive evidence was that layer 7, and not layer 9, as shown in Exhibit 39, was fairing compound. The compatibility test performed by AwlGrip revealed that layer 7 was incompatible with the AwlGrip two-part topcoat. Consistent with those findings, AwlGrip, through Exhibit 48 entitled "Awlspec," dated November 10, 2014 at Bates No. 386, prescribed taking the hull "back to its original gel coat surface." Platypus now objects to this statement asserting that it is hearsay, but no such objection was made at trial on this agreed exhibit. Marine surveyor Ronald M. Reisner ("Reisner") in his testimony supported the AwlGrip recommendation that all coatings be removed back to the original gel coat. His testimony, based upon his years in the field of marine surveying and boat building, that layer 9 was gel coat and not fairing compound, was the most clear and explicit evidence presented concerning the interpretation of the AwlGrip test results.

What relevance this dispute has to the Court's decision is questionable. Neither the Obertos nor Platypus entered into a contract that contemplated taking off all undercoatings, including fairing compound, down to the gel coat. This option was

---

[1] The fairing layer is the first layer of material over the fiberglass substrate which smooths out defects in the hull and prepares it for top finishes.

DECISION, FINDINGS OF FACT
AND CONCLUSIONS OF LAW - 2

considered and rejected by the Obertos in conversations held at the inception of the relationship and contract as memorialized in the Captain's Report, which was admitted as Exhibit 45. The scope of work was limited to sanding and painting. Had the compatibility test been performed, a different contract involving substantially more work and cost could have been considered and either the parties would have agreed (1) to have the more extensive and expensive work performed; (2) to proceed with the work that was ultimately performed; or (3) that no contract would be entered into and no work would be performed.

At the conclusion of the trial the Court asked the parties to address through post-trial briefing, among other things, the questions of whether Platypus could have and would have cured the breach through the honoring of its warranty or whether the Obertos foreclosed that opportunity.

Platypus had attempted to satisfy the Obertos by proposing a couple of different solutions to addressing the paint problems. These included a "scuff and shoot," consisting essentially of sanding out the imperfections and reapplying a coat of paint, or to do essentially the same work but apply white paint instead of the blue, which would perform better since less solar heat would develop and thereby reduce the potential for blistering and detachment of undercoatings. Apparently, neither of these options were acceptable to the Obertos.

Discussions for cure did not end abruptly, as often is the case when parties in contract disputes reach an impasse and further discussions are ruled out. Here, the last communication on the matter from Judson Linnabary, the owner of Platypus, to the Obertos was in a letter dated November, 13, 2014, and admitted at trial as Exhibit 58, in which the alternatives for cure were laid out.

The Obertos' concluding communication was unclear as to what course they might take. In an email addressed to Linnabary, dated November 25, 2014 and

admitted as trial Exhibit 60, the Obertos simply replied, "We are still investigating the paint issues and evaluating our options. We will let you know."

In the end the Court cannot and need not determine whether Platypus was denied the opportunity to cure its default. The failure to test the existing undercoats for compatibility with the AwlGrip paint product at the beginning of the work was the cause of the resulting damage to the paint, both under the new coat and the sublayers. The evidence is unclear whether either of the proposed cures by Platypus would have, in fact, solved the issues to any acceptable degree.

The question that was left to be decided is what remedy will be imposed by the Court for Platypus' breach of contract. While there are a number of approaches that have been or could have been argued, the fundamental principle in fashioning a remedy is to make an award that, as reasonably as possible, best makes the injured party whole; that is, the one that puts the non-breaching party in the place it was before the contract was entered into, together with resulting damages, if proven, that arose from the defective performance by the breaching party.

Given the nature of the breach of contract that arose at the inception of the work, the best available remedy for that breach is for Platypus to refund to the Obertos all moneys that it received under the contract. Although, conceivably other damages could have been claimed such as loss of use or the marginal increase in cost of removing the Platypus-applied coatings, there was no evidence admitted on these. Perhaps that is just. Whatever the problems that still exist in the MAXIMO's painted hull, no one has argued that its appearance is worse than when it first entered the Platypus boatyard. The Obertos could conclude that they can live with the paint issues and have a better paint job than they had previously, at no cost other than the cost of this litigation.

Although the Court has determined that Platypus breached the parties' contract, Platypus' breach and its acts while discussing potential cures did not constitute a

DECISION, FINDINGS OF FACT
AND CONCLUSIONS OF LAW - 4

violation of the Washington Consumer Protection Act ("CPA"), RCW §19.86. In a CPA claim, the plaintiff must prove, among other requirements, that an unfair or deceptive act or practice has occurred that has an impact upon the public interest. The closest the Obertos come to establishing an unfair or deceptive act is showing that Platypus failed to produce all of the AkzoNobel report. However, this case involves a private dispute between the Obertos and Platypus based on unique facts. None of the actions of Platypus have the potential to deceive a substantial portion of the public. Moreover, the Obertos have failed to show they were damaged by any failure to produce the AkzoNobel report. Nor have the Obertos established that the failure to produce the AkzoNobel report constituted a material misrepresentation of the condition of the MAXIMO.

In addition to the foregoing, having heard and reviewed the testimony of the witnesses, the evidence of records, and the contentions and arguments of counsel, the Court, in accordance with Rule 52(a) of the Federal Rules of Civil Procedure, makes additional findings of fact and conclusions of law as follows:

## FINDINGS OF FACT

1. Plaintiffs Obertos are the owners of the M/Y MAXIMO.

2. Defendant Platypus is a Washington corporation with its principal place of business in Port Angeles, Clallam County, Washington.

3. Defendant operates a shipyard with indoor painting facilities in Port Angeles, Washington.

4. On October 22, 2013, Platypus submitted a bid to paint the MAXIMO for $120,000, plus additional work on a time and material basis.

5. On February 3, 2014, Stephen Oberto signed the November 27, 2013 bid committing to paint the topsides (only) of the boat for $32,600.

6. On or about February 4, 2014, Stephen Oberto and Platypus signed a written agreement dated February 4, 2014 to paint the MAXIMO for $125,000 and for

other repair work to be performed by Platypus on the MAXIMO. The February 4, 2014 agreement is also a part of the parties' contract for Platypus' work on the MAXIMO.

7. The February 4, 2014 proposal provides: "Haul out vessel for complete paint from waterline up to top of mast using Awlgrip coatings. Owners choice of colors."

8. "Awlgrip" is a brand of marine paint and coating products manufactured by AkzoNobel Coatings, Inc., whose parent company is AkzoNobel N.V., a multi-national corporation headquartered in the Netherlands (collectively, "AkzoNobel").

9. The February 4, 2014 proposal provides:

- "All paint finishes are guaranteed one (1) year for gloss retention and adhesion";
- "Platypus Marine guarantees our own workmanship for a one-year time period";
- "Any additional work or warranty will be performed at the Platypus marine facility."

10. The February 4, 2014 Proposal provides: "All coatings will be applied according to Manufacturer's specifications and procedures." The manufacturer's (AkzoNobel's) specifications and procedures for the application of Awlgrip coatings are set forth in a publication entitled the "Awlgrip Application Guide."

11. The February 4 proposal also provides in pertinent part:

004. Paint Hull Topsides: Sand, prime with Epoxy 545 primer followed with two coats Awlgrip finish coating; includes transom with stripes and graphics on transom and sign board; includes all materials (color to be specified by owner). If a post cure is needed it will add additional cost.

12. It was a basic assumption of the agreement that Platypus would be painting over a system that was compatible with Awlgrip.

13. Under the terms of the agreement, the Obertos would be responsible on a time and material basis for any additional costs related to taking the coatings down to a suitable surface to apply Awlgrip paint.

14. Under the terms of the agreement, the Obertos would be responsible on a time and material basis for any additional costs related to refairing the boat.

15. As delivered to the Platypus facility on or about February 3, 2014, the MAXIMO's hull topsides bore several layers of existing coatings over its fiberglass substrates. The coatings on the MAXIMO as delivered to Platypus were in poor condition. The coatings were faded and worn. There were issues with print through and the surface was not fair.

16. On or about February 3, 2014, Platypus hauled the MAXIMO, pressure-washed it, brought the vessel into its indoor facility, and set it up on blocks.

17. In addition to other conversations between Platypus and Stephen Oberto, a "captain meeting" was held on a weekly basis to discuss the project.

18. The Awlgrip Application Guide sets forth procedures for the compatibility testing of a vessel's existing coatings prior to the application of Awlgrip coatings.

19. Platypus did not perform a compatibly test on the coatings on the hull topsides.

20. Had Platypus performed a compatibility test "according to Manufacturer's specifications and procedures," it would have been discovered that the pre-existing system was not compatible with Awlgrip.

21. The Awlgrip Application Guide sets forth procedures for surfacing and fairing the surface of a boat. Surfacing is accomplished using a high-build product to fill in small imperfections on the surface of the boat. Fairing is accomplished using a fairing compound to set the shape and finish of the yacht.

22. Given the issues with the surface of the MAXIMO, Platypus discussed with Stephen Oberto two options: surfacing the hull of the boat or refairing the hull of the boat. The surfacing option would be accomplished by sanding the existing coatings smooth and applying highbuild over the existing coatings. The fairing option would be accomplished by removing all of the current coatings on the vessel down to the fiberglass substrates and then applying a fairing compound. Platypus explained that to guarantee a yacht quality finish it would be necessary to undertake the second option: refair the boat. The refairing option was substantially more expensive than the surfacing option.

23. The Obertos did not want to pay for the cost of re-fairing the boat. They indicated they were fine with a commercial finish and, therefore, only authorized the first option: surfacing the boat.

24. The agreement to surface the boat was included in a signed captain's report where the parties agreed: "Hull print through Repair: Sand down and Prime hull with ultra build to fill print through."

25. As per the agreement, Platypus surfaced the MAXIMO by sanding the existing surfaces of the MAXIMO's hull topsides, exposing various layers of her existing coatings.

26. As per the agreement, Platypus did not take the MAXIMO's hull topside coatings down to fiberglass substrates prior to repainting the vessel.

27. As per the agreement, on or about February 17, 2014, Platypus applied Awlgrip "Highbuild" primer coatings to the MAXIMO's hull topsides over layers of existing coatings that remained on the hull after sanding.

28. As per the agreement, on or about February 28, 2014, Platypus applied Awlgrip "545" primer coatings to the MAXIMO's hull topsides, over the Awlgrip "Highbuild" primer that had been previously applied by Platypus.

29. As per the agreement, on or about March 7, 2014, Platypus applied Awlgrip topcoats, colored "Flag Blue," to the MAXIMO's hull topsides, over the Awlgrip "545" primer that had been previously applied.

30. The cost of painting the hull topsides was as follows:

| | | |
|---|---|---:|
| 001 | Haul Out and Launch | $1,180.00 |
| 003 | Pressure Wash | $1,170.00 |
| 004 | General Protection | $1,336.60 |
| 004B | General Protection | $1,163.40 |
| 008 | Hardware Removal (50% per testimony of Bruce Bryant, December 21, 2017, p. 498, lines 6-13) | $5,350.00 |
| 009 | Hardware Reinstall (50%) | $25.56 |
| 009B | Hardware Reinstall (50%) | $5,724.44 |
| 0120 | Hull Repairs | $1,913.04 |
| 0121 | Hull Print Through Repairs | $19,000.00 |
| 0125 | Paint Hull Topsides | $30,000.00 |
| 1209 | Caulking | $4,500.00 |
| 0212 | Fiberglass Repair | $10,292.28 |
| 0002 | Blocking | $1,170.00 |
| | Facility Fees | $6,664.00 |
| | Subtotal | $89,489.32 |
| | Tax (8.4%) | $7,517.10 |
| | **Total Paid to Paint Hull Topsides** | **$97,006.42** |

The costs of fiberglass and hull repairs are unrelated to the costs associated with painting the boat and, therefore, are deleted from the above-stated tally in order to obtain an accurate total cost associated with Platypus' paint work on the hull topsides. After tax, this total is $83,775.86 ("Amount Charged"). The Obertos paid Platypus $58,775.86 for this work. This was calculated by deducting the $25,000 holdback from the Amount Charged.

31. On or about April 10, 2014, Platypus requested the Obertos and AkzoNobel Technical Field Representative Curtis "Ray" Tucker ("Tucker") come to Platypus' facility to inspect the work on the MAXIMO, because a cosmetic problem had arisen with the coatings.

32. On or about April 11, 2014, Stephen Oberto, Platypus, and AkzoNobel's Mr. Tucker met at Platypus' facility to inspect the vessel and discuss the problems that had arisen with the coatings on the MAXIMO.

33. As memorialized in a letter drafted by Platypus dated April 11, 2014, which was signed by Stephen Oberto and Platypus' President, Judson Linnabary, Platypus stated that it "will be working closely with the Awlgrip Company and their representative to come up with a solution to the paint problems we are experiencing on Maximo. It is our intention to remedy this situation and correct the hull defects regarding the paint shrinkage/print through, in a manner that insures the best possible outcome."

34. The parties agreed that the Obertos could withhold the sum of $25,000 from their payment on Platypus' final invoice.

35. Platypus contacted a number of experts to determine how to resolve the problem.

36. On or about October 6, 2014, the Obertos returned with the MAXIMO to Platypus' facility in Port Angeles.

37. On or about October 7, 2014, Stephen Oberto, Platypus, and AkzoNobel's Tucker met at Platypus' facility to inspect the MAXIMO and to discuss the problems with her coatings. The parties and Tucker agreed that core samples from the MAXIMO's hull should be taken and sent to the Awlgrip laboratory for testing and analysis in order to identify the root cause of the coatings defects.

38. While the MAXIMO was at Platypus, Platypus explained to Stephen Oberto that it would cost $250,000 to remove all of the coatings and refair the boat. Stephen Oberto refused to pay the costs of refairing the boat.

39. On or about October 7–8, 2014, two core samples, each being approximately 2.5 inches in diameter, were taken from the MAXIMO's hull topsides and shipped to the Awlgrip laboratory in England for testing and analysis.

40. On or about October 8-9, 2014, Platypus patched the two areas on the MAXIMO's hull topsides from which the core samples had been taken and touched-up the surrounding topcoat paint.

41. On or about October 10, 2014, the MAXIMO was re-launched from Platypus' facility.

42. On or about October 31, 2014, AkzoNobel issued an email and lab report to Platypus containing the analysis of the two core samples that had been taken from the MAXIMO. The report contained the following chart that discussed the various layers of coatings:

| Layer | Color | Thickness (µm) | Spectral Interpretation / Comments |
|---|---|---|---|
| 1 | Dark blue | 40 - 50 | Good match to Awlgrip Topcoat. |
| 2 | Off-white | 40 - 50 | Good match to Awlgrip 545 Primer. |
| 3 | Pale grey | 430 - 460 | Good match to Awlgrip High Build Epoxy Primer. |
| 4 | Green | 0 - 30 | Poly(ester:urethane). Possibly Awlgrip Topcoat. |
| 5 | Off-white | 20 - 40 | Good match to Awlgrip 545. |
| 6 | Dull green | 50 - 110 | Soft, slightly rubbery coating. Polyurethane containing crystalline silica. No good product matches. |
| 7 | Off-white | 20 - 70 | Soft, slightly rubbery coating. Poly(ether:urethane) with talc and crystalline silica. Contains some micaceous iron oxide particles. |
| 8 | Yellow/brown, clear | <10 | Too thin to sample. Not analyzed. |
| 9 | Off-white | 370 - 420 | Styrenated *iso*-phthalate polyester. |

43. Marine surveyor Reisner correctly identified layer 7 as fairing compound and layer 9 as the gel coat substrate.

44. The last page of this initial Awlgrip lab report contains a "recommendation" section stating the following: "To repair the reported issue it is recommended to remove all existing coatings that are not compatible with the Awlgrip

DECISION, FINDINGS OF FACT
AND CONCLUSIONS OF LAW - 11

coatings system. Use the coatings compatibility & adhesion test in our Application Guide to determine compatibility where unknown coatings are suspected."

45. In order to assure paint adherence to a compatible surface, all coatings, including the fairing compound, would have to be removed.

46. On or about November 5, 2014, AkzoNobel issued an email and revised Awlgrip lab report to Platypus.

47. On or about November 10, 2014, Platypus emailed the Obertos the revised version of the Awlgrip lab report with a cover email stating, "Hi Kim/Steve, This is what was sent to us by awlgrip. We have been over it last week with discussions and I have done a lot of research as well. I would like to talk to you about this and try to come to a decision with you guys and schedule your boat when convenient for you and we can accommodate the work."

48. On or about November 11, 2014, the Obertos emailed Platypus, acknowledging their receipt of the Awlgrip lab report, and requesting that Platypus send a proposal to resolve the paint issues on the MAXIMO.

49. During the approximate time frame of November 11-13, 2014, Platypus communicated with AkzoNobel's Tucker and requested that Tucker draft a document that would further describe the Awlgrip lab report.

50. On or about November 13, 2014, Tucker issued an undated letter, stating the following:

> There are a couple of different ways that this problem can be fixed. The removal of all coatings and starting over would insure that the problem would be resolved. However, this may not be feasible for either Platypus or the Obertos. A second alternative would be to do further testing on some of the impacted areas on the hull side to check the integrity of the damaged coatings. If the testing concluded that it would be worth attempting a scuff and shoot then that would be best for all involved. Unfortunately Awlgrip would only be able to warranty the first alternative of the removal of all coatings, Awlgrip warranties are limited to approved schemes and since some of the existing coatings have been determined to be single pack, and are not part of an approved scheme no warranty is allowed. This does not mean that this is the best alternative for the parties involved. Obviously a two pack paint scheme on Maximo has existed over the top of a one pack

paint scheme for some time. It is worth investigating the second alternative to avoid further financial impact to either party and two avoid a lengthy full re-fair.

51. On December 15 and December 17, 2014, Reisner examined the coatings on the MAXIMO. Reisner did not notice any problems with adhesion or gloss retention.

52. The Obertos witheld $25,000 under their contract with Platypus.

## CONCLUSIONS OF LAW

1. This court has jurisdiction under 28 U.S.C. §§ 1333 and 1367.

2. Venue is proper pursuant to 28 U.S.C. § 1391.

3. The contract in this case is maritime in nature as it concerned the painting and repair of a boat. *Kossick v. United Fruit Co.*, 365 U.S. 731, 735, (1961); *THE JACK-O-LANTERN*, 258 U.S. 96, 42 S. Ct. 243, 66 L. Ed. 482 (1922).

4. Basic principles of the common law apply to maritime contracts. *Clevo Co. v. Hecny Transp., Inc.*, 715 F.3d 1189, 1194 (9th Cir. 2013).

5. Oral contracts are generally regarded as valid by maritime law. *Kossick*, 365 U.S. at 734; *Texaco Exp., Inc. v. Overseas Tankship Corp.*, 573 F.2d 717, 720 n.8 (2d Cir. 1978); *Sun Oil Co. v. Dalzell Towing Co.*, 55 F.2d 63, 64-65 (2d Cir.), *aff'd*, 287 U.S. 291 (1932).

6. The parties' contract in this case is a patchwork of oral and written statements, evidenced by Platypus' signed bid, contemporaneous oral agreements and subsequent written promises. There was never, at any time, any fully integrated, written document containing all the material terms of the parties' contract.

7. The parties also agreed that Platypus would surface the MAXIMO: "Hull print through Repair: Sand down and Prime hull with ultra build to fill print through."

8. Platypus breached the contract by failing to perform the compatibility testing outlined in the Awlgrip specification manual.

9. Under general contract law, "a party to a contract who is injured by its breach is entitled to compensation for the injury sustained and is entitled to be placed, insofar as this can be done by money, in the same position he would have occupied if the contract had been performed." *Rathke v. Roberts*, 33 Wn.2d 858, 865 (1949). However, "he is not entitled to be placed in a better position than he would have been in if the contract had not been broken." *Id*.

10. In the present case, a primary assumption in the formation of the contract was that the existing coatings were compatible with Awlgrip and could be painted over. At the time of entering into the contract, Platypus could not have known the make of the underlying coatings. However, the failure of Platypus to appropriately test the underlying coatings breached the contract by failing to apply the specified Awlgrip paint manufactured by AkzoNobel "according to Manufacturer's specifications and procedures."

11. Because of this breach, the Obertos are entitled to be placed in the same position as if the contract was never broken. Because the Obertos and Platypus had also agreed that the Obertos did not want to pay for the cost of refairing the boat and only authorized surfacing the boat, it would place the Obertos in a better position than they had contracted for if the Court required Platypus to do the refairing or pay the cost for doing so.

12. The Obertos are entitled to recover from Platypus the amount they paid for the painting of the hull topsides, totalling $58,775.86.

13. Federal maritime law displaces conflicting state law. *Wilburn Boat Co. v. Fireman's Ins. Co.*, 348 U.S. 310, 314 (1955). Under federal maritime law, the Court applies the American rule that each party bears its own attorneys' fees absent a contractual provision or governing statute. *Golden Pisces, Inc. v. Fred Wahl Marine Const., Inc.*, 495 F.3d 1078, 1081 (9th Cir. 2007).

14. Under the CPA, RCW §19.86, attorneys' fees and treble damages may be awarded. To prevail on a CPA claim, a plaintiff must prove all five of the following elements:

> (1) an unfair or deceptive act or practice; (2) occurring in the conduct or trade or commerce; (3) an impact upon the public interest; (4) an injury to the plaintiff's business or property; and (5) causation.

*Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wn.2d 778 (1986).

15. For purposes of the CPA, an act is only unfair or deceptive if it has "the capacity to deceive a substantial portion of the public." *Sign-O-Lite Signs, Inc. v. DeLaurenti Florists, Inc.*, 64 Wn. App. 553, 561 (1992) (quoting *Hangman Ridge*, 105 Wn.2d at 531). Furthermore, for conduct to be capable of deceiving a portion of the public, the actor must have "misrepresented something of material importance." *Hiner v. Bridgestone/Firestone, Inc.,* 91 Wn. App. 722, 730 (1998), *rev'd on other grounds,* 138 Wn.2d 248, 978 P.2d 505 (1999). Conduct that occurs between two parties in isolation is not the type of conduct regulated by the CPA. *Segal Co. (E. States), Inc. v. Amazon.Com*, 280 F. Supp. 2d 1229, 1232, n. 3 (W.D. Wash. 2003); *see also Henery v. Robinson,* 67 Wn. App. 277, 291 (1992).

16. This case involves a private dispute between the Obertos and Platypus based on unique facts. None of the actions of Platypus were "deceptive," nor did they have the ability to deceive a substantial portion of the public. The Obertos were not damaged by any failure to produce the entirety of the original AkzoNobel report. Nor have the Obertos established that the failure to produce the full AkzoNobel report constituted a misrepresentation of the condition of the MAXIMO.

17. In the present case there is little or no chance of any isolated, unfair, or deceptive act being repeated. The fact that Platypus has other customers is not sufficient evidence that there is a likelihood of repetition. *Accretive Tech. Grp., Inc. v. Adobe Sys., Inc.*, No. C15-309RSM, 2015 WL 4920079, *11 (W.D. Wash. Aug. 17, 2015). The Obertos have not established that there is a "likelihood that additional

DECISION, FINDINGS OF FACT
AND CONCLUSIONS OF LAW - 15

plaintiffs have been or will be injured in exactly the same fashion [sufficient to change this matter] from a private dispute to one that affects the public interest." *Hangman Ridge*, 105 Wn.2d at 790.

18. There is no reason to depart from the American rule regarding attorneys' fees as outlined in *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y,* 421 U.S. 240, (1975).

19. The federal judgment rate should apply to any prejudgment interest award absent substantial evidence that the equities justify a different rate. *Western Pacific Fisheries, Inc. v. S.S. President Grant*, 730 F.2d 1280 (9th Cir. 1984). In the present case, the equities do not justify a different rate.

DATED this 22nd day of February, 2018.

                                                BENJAMIN H. SETTLE
                                                United States District Judge